UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

UNITED STATES OF AMERICA

-vs-   Case No.: 2:08-cr-129-FtM-99SPC

ASHRAF MOHAMMED
_____

## REPORT AND RECOMMENDATION

**TO THE UNITED STATES DISTRICT COURT**

This matter comes before the Court on the Defendant, Ashraf Mohammed's Motion to Suppress Evidence and Memorandum of Law (Doc. #20) filed on May 1, 2009. The Government filed its Response in Opposition (Doc. # 25 ) on May13, 2009. A hearing was held before the undersigned on May 18, 2009. The Defendant was present and represented by Assistant Federal Public Defender Russell Rosenthal. The Government was represented by Assistant United States Attorney Jeffrey Michelland. At that hearing, the Government called three witnesses: Dep. Jamie Keith Nolen, Dep. Michael Ellis, and Dep. David Lebid and introduced photographs of the area of the traffic stop, the Lee County Sheriff's Office Incident Recall, and a copy of a <u>Miranda</u> warning card. The Defense did not call any witnesses but introduced the County Sheriff's Office Citizen Contact Report. Due to the length of the hearing, the parties requested a copy of the transcript and moved for additional time in which to argue their respective positions. A Final Argument Hearing on the Motion to Suppress was heard before the undersigned on June 3, 2009.

## TESTIMONY AND EVIDENCE

**Deputy Jaime K. Nolen : (Tr. 4 - 112)**.

Deputy Jaime Nolen (Dep. Nolen) has been with the Lee County Sheriff's Office (LCSO) for the past six and one half (6 1/2) years. (Tr. 5:15-17). He spent four of those years in the Gang Unit and is currently a detective in the Special Investigations Unit. (Tr. 5:18-23). In his experience, he has done between five (5) and 10 traffic stops per day during that time. (Tr. 7:6-11).

On May 2, 2009, Deputy Nolen was on patrol with Deputy Michael Ellis (Dep. Ellis). (Tr. 10:10-25). At approximately 8 p.m.,[1] he observed a silver Dodge Durango SUV stop at the stop sign at the corner of Carolina and Tice Streets. (Tr. 11:10-12, 13:22-24). He noted the windows on the vehicle appeared extremely dark so much so that he could not observe the driver of the vehicle through the glass or see any light coming through the windows. (Tr. 15:5-11). He effected a traffic stop whereby the driver turned into the Tice Food Mart parking lot. (Tr. 19:2-5). Dep. Nolen testified that even in the lit parking area, he could not see the driver through the driver's side window. (Tr. 21:17-20).

Dep. Nolen approached the Durango at which time the Defendant rolled down the driver's side window. (Tr. 21:24-25, 22:1-2 ). Dep. Nolen asked him for his driver's license, registration and proof of insurance and explained why he had stopped the vehicle. (Tr. 22:22-24). He took the documents back to his patrol vehicle and called dispatch for information on the driver, the Defendant, Mr. Mohammed.(Tr. 23:6-8). Although he found out the Defendant had a valid driver's

---

[1] The actual time of the call in of the traffic stop was 8:08 p.m.  (Tr. 15:18-21).

license and was not wanted on any outstanding warrants, he was told the Defendant was a convicted felon. (Tr. 24:6-16).

Dep. Nolen took out his department issued tint meter, calibrated it, and tested the driver's and passenger's front window. (Tr. 28:8-18). The readout was 18%[2] on both the front passenger and front driver's side windows which was below the threshold amount of 28%, the legal limit per Florida Statute. (Tr. 29:17-21). Dep. Nolen showed the Defendant the readout on the tint meter. (Tr. 28:21-25, 29:1-2). He estimates that it took him from between 8:10 to 8:13 until 8:20 or 8:25 to prepare the paperwork for a warning.[3] (Tr. 31:9-17). After filling out the warning paperwork, he approached the Defendant, explained the warning, asked him if he had any decal regarding the tint, explained the tint was illegal and that he would have to have it removed, and told him he was free to go at that time. (Tr. 32:22-25, 33:1-4 ).

At that same time, Dep. Nolen asked the Defendant if he had anything in his vehicle that the deputy should be aware of: dead bodies, guns, bombs, drugs.[4] (Tr. 33:12-14). The Defendant replied that there was nothing in the car he should be aware of. (Tr. 23:3-4). Dep. Nolen then testified that

---

[2]The actual warning citation indicated the window tint illegally tested at 19%. (Tr. 32:11-13).

[3]At the time of the stop, Dep. Nolen had only been using this particular tint meter for a couple of months. He had, however used a different model for four years prior to that. He had received training on how to calibrate the new model and how to use it. He had used it approximately 5 to 6 times a day since he got it during the course of his traffic stops. At the time, he was not issuing tickets for tint violations, but was writing warnings.

[4]Dep. Nolen tries to search every vehicle during a traffic stop. That way, if it comes to a point where anyone says that he searched someone because they were a certain race or gender, he can say, "No, I search everybody's car, and that is what I attempt to do at every traffic stop." (Tr. 54:21-22).

he asked the Defendant if he had a problem with him searching the vehicle? The Defendant replied, No. (Tr. 34:7-8 ). Dep. Nolen then clarified by asking, No, you're not sure? or No, I can't search?, or No, it's okay, I can search? (Tr. 34:8-9). The Defendant responded, Yes, you can search. (Tr. 34:10). Although Dep. Nolen could not remember the exact words he said, he felt the Defendant understood his question and that he could search the vehicle, especially in light of his validating the question and answers. (Tr. 34:11-20, 59:18-25, 61:9-14). Dep. Nolen did not coerce the Defendant into agreeing to allow the search nor did he promise him anything nor threaten him in any way. (Tr. 35:14-23 ). The Defendant was not handcuffed at that time and was free to leave. (Tr. 36:7-8).

Dep. Nolen approached the vehicle driver's side door which was already open and located a cigarette box in the driver's side door pocket. (Tr. 37:18-21). He shook the box, which made a metalic sound, opened it, and found five (5) .38 special rounds of ammunition. (Tr. 37:21-25). Dep. Nolen asked the Defendant if they were his. (Tr. 38:18-19). The Defendant indicated they belonged to his boss but that he was aware they were in the vehicle. (Tr. 38:18-22, 40:16-17 ).

Based upon that admission, Dep. Ellis placed the Defendant in handcuffs and read him his <u>Miranda</u> warnings from a card. (Tr. 40:18-21). The Miranda rights were read at 8:30 p.m. (Tr. 70:4-6, 20-25, 71:17-19). The Defendant was placed in handcuffs because he was a convicted felon who had ammunition, and because of officer safety. (Tr. 41:12-19). Dep. Nolen suspected that based upon finding ammunition in the vehicle, there may also be a weapon in the vehicle. (Tr. 42:1-2). He asked the Defendant if there were any weapons in the vehicle to which the Defendant replied there weren't. (Tr. 42:16-23). Dep. Nolen continued to search the vehicle and found a gun underneath a box speaker in a compartment. (Tr. 43:1-7). The weapon was a .38 pistol which was wrapped in cloth. (Tr. 43:6-7). At that time, Dep. Ellis asked him about the firearm. (Tr. 43:13-

14). The Defendant stated the firearm belonged to his friend Matt, and that he had left it in the car after they had gone to Babes. (Tr. 44:12-15). The Defendant said he wanted to secure the weapon so he separated the rounds from the gun, left the rounds in the front of the vehicle and placed the firearm in the back of the vehicle. (Tr. 44:15-19). He indicated the firearm had been left there on Tuesday, April 29, and that he had found it on April 30. (Tr. 44:20-22, 45:11-14). He confirmed that he was a registered felon and that he was not supposed to be in possession of a firearm. (Tr. 45:21-25 ). The Defendant indicated that he forgot the gun was there. (Tr. 46:7-9). The Defendant was arrested for Possession of a Firearm by a Convicted Felon at 8:42 p.m., 34 minutes after the initial stop of the vehicle. (Tr. 106:8-23).

Dep. Nolen heard Dep. Lebid call Aaron and ask him about the firearm. (Tr. 47:14-17). Aaron indicated it was not his firearm.(Tr. 47:16-19).

**Deputy Michael James Ellis: (Tr. 113 - 171).**

Deputy Ellis has been with the LCSO for approximately 6 years. (Tr. 113:6-11). He was on duty the night of May 2, 2008 in the are of Tice and Ortez. (Tr. 114:4-9). He was riding with Dep. Nolen on the evening when they observed a Durango at the corner of Carolina and Tice Streets. (Tr. 114:19-25). He observed the windows were pretty dark and that he could not see through the driver's side window. (Tr. 115:1-12). He could, however, see a slight silhouette of the driver through the driver's side window. (Tr. 115:17-22). They effected a traffic stop on the vehicle in the area of the Handy Food Mart parking lot. (Tr. 117:17-25).

Dep. Ellis approached the passenger side of the vehicle while Dep. Nolen approached the driver's side of the vehicle. (Tr. 118:14-16). Although he could not hear the entire conversation, after Dep. Nolen had the Defendant step out of the vehicle, he could hear Dep. Nolen explain about

the window tint being too dark. (Tr. 121:12-25 ). He observed Dep. Nolen return to the police car with the Defendant's driver's license and registration. (Tr. 122:1-4). Everything was running at a normal pace. (Tr. 122:7-8). At that time, Dep. Nolen returned to the Defendant's vehicle with a tint meter and measured the windows. (Tr. 122:10-14). He heard Dep. Nolen explain to the Defendant that his tint was too dark. (Tr. 123:16-21). The Defendant told him he bought the car that way. (Tr. 124:12-15). Dep. Nolen returned to his vehicle to write out the warning and then gave the Defendant the written warning. (Tr. 124:20-23). He also gave the Defendant his paperwork back. (Tr. 125:2-4 ).

At that time, Dep. Nolen asked the Defendant if he had a problem with them searching the vehicle? (Tr. 125:6-9). The Defendant replied, No. (Tr. 125:21-25, 126:1). Dep. Nolen then confirmed, No you don't want me to search or no, you don't have a problem with me searching? (Tr. 126:1-4 ). The Defendant did not have a problem with them searching the vehicle and gave verbal consent. (Tr. 126:4-7). The consent was not forced or coerced. (Tr. 126:8-12).

Dep. Nolen began the search at the front driver's side door of the vehicle. (Tr. 127:19-23). At that time, the Defendant was not handcuffed but was standing in front of the patrol car which was behind his own vehicle. (Tr. 127:14-18). Dep. Ellis observed Dep. Nolen locate some .38 rounds in a cigarette pack. (Tr. 128:15-20). Dep. Nolen approached the Defendant and asked if there was a reason why he had .38 rounds in a cigarette pack? (Tr. ). He was also asked if there was a gun as well as the ammunition they had just found. (Tr. 129:19-22). The Defendant stated no. (Tr. 130:1).

After the ammunition was found, Dep. Ellis handcuffed the Defendant since is was illegal for a felon to have ammunition in his possession. (Tr. 128:21-25, 129:1-8). He did not know if, or where there was a gun. (Tr. 129:6). He then read the Defendant his <u>Miranda</u> warnings from a

Miranda card. (Tr. 129:17-). He read the warning at 8:30 pm. (Tr. 133:2-4). The Defendant responded that he understood his rights and would speak with them. (Tr. 131:22-25, 132:1-2).

At that point, Dep. David Lebid (Dep. Lebid) and Dep. Robert Gunn (Dep. Gunn) arrived as backup. (Tr. 132:3-6). Dep. Lebid began to question the Defendant about the ammunition. (Tr. 132:20-25). The Defendant indicated he was aware of the ammunition but that it belonged to his boss, Aaron. (Tr. 132:20-25, 133:1, 133 17-21). Dep. Lebid asked the Defendant for his bosses phone number. (Tr. 133:22-25). Dep. Ellis overheard Dep. Lebid speaking with Aaron who didn't know what he was talking about. (Tr. 135:9-18).

Dep. Ellis observed Dep. Nolen continue to search the vehicle. (Tr. 136:9-10). Dep. Ellis specifically asked the Defendant if he had a .38 in the vehicle to which the Defendant replied there was nothing else in the truck. (Tr. 136:20-25, 137:1-12). Dep. Nolen found a .38 firearm in the rear compartment of the SUV underneath a speaker. (Tr. 137:13-18). He confronted the Defendant. (Tr. 137:19-21). The Defendant's story changed. (Tr. 137:1-3). He acknowledged that he knew the gun was in the vehicle and that a few days before he and a friend, Matt, had gone to Babes and before entering the nightclub, Matt had left the gun in the vehicle. (Tr. 138:5-12, 139:3-7). The next day, he realized the gun was still in the vehicle and he knew he was not allowed to possess it so he unloaded it, put the rounds in the cigarette pack, and put it underneath the speaker in the compartment after wrapping it in a piece of cloth. (Tr. 139:11-20). When the Defendant was asked why he didn't just get rid of the gun, he said he didn't know. (Tr. 139:22-25, 140:1). He was also unable to provide Matt's last name. (Tr. 141:13-17).

**Deputy David Lebid: (Tr. 172 - 192).**

Dep. Lebid has been with the LCSO gang unit since December 31, 2007. (Tr. 173:5-7). Prior to that time, he was with the FMPD for approximately three and one half (3 ½) years. (Tr. 173:8-10). On May 2, 2008, he was on patrol and responded as backup to Dep. Nolen and Dep. Ellis. (Tr. 173:19-25, 174:1-14). He arrived at the scene at approximately 8:25 p.m. (Tr. 174:22-25, 175:1). He approached Dep. Ellis who was standing outside of the vehicle with the Defendant. (Tr. 175:11-13). Shortly after his arrival, Dep. Ellis read the Defendant his <u>Miranda</u> warnings. (Tr. 175:22-24). He does not recall if there were bullets found prior to his arrival, however, he recalls a firearm being found after his arrival on scene. (Tr. 176:19-25). He does recall, however, that <u>Miranda</u> was read prior to the location of the firearm. (Tr. 177:1-3). After <u>Miranda</u> was read by Dep. Ellis, he recalls the Defendant agreeing to speak with them. (Tr. 177:8-12). He asked the Defendant where the round of ammunition came from. (Tr. 181:1-2). The Defendant told him they belonged to his boss, Aaron, and that Aaron has a gun, a .38. (Tr. 181:2-5). The Defendant supplied Dep. Lebid with Aaron's phone number. (Tr. 181:5-6). He called Aaron and identified himself as a law enforcement officer and inquired if the Defendant worked for Aaron and whether he owned a .38 handgun. (Tr. 181:7-12). Aaron said he did not own a .38 handgun. (Tr. 181:13). He also asked about .38 ammo and Aaron told him that he did not have any .38 ammunition either. (Tr. 181:16-20). When he confronted the Defendant with that information, the Defendant said something to the effect of I don't know what to say to you. (Tr. 181:14-17). He appeared to be at a loss for words. (Tr. 181:20).

**DISCUSSION**

The Defendant raises four (4) grounds in his Motion to Suppress as follows: (1) the initial stop of the vehicle was unlawful; (2) the subsequent detention of the Defendant was unlawful and the search of his vehicle was a product of that unlawful detention; (3) there was no valid consent to search; and (4) any statements made by the Defendant were made in violation of his Miranda rights. The Government responds that the stop of the vehicle was justified under Florida law, the detention was not too long for the nature of the stop, the Defendant's consent was voluntary, and finally, the Defendant's statements were made in accord with Miranda.

*(1) Whether the Initial Stop of the Vehicle was Unlawful*

The Defendant claims the vehicle was stopped without sufficient justification in violation of the Fourth Amendment. While the Defendant agrees that a traffic stop for a violation is lawful even if that stop is a pretext, the actual violation must be present for the stop to be valid. The Government states the vehicle was stopped based upon the reasonable belief the Defendant's window tint violated Florida law.

On May 2, 2009, Dep. Nolen, on patrol with Dep. Ellis, observed the Defendant's silver Dodge Durango SUV stop at the stop sign at the corner of Carolina and Tice Streets. (Tr. 10:10-25,11:10-12, 13:22-24). He noted the windows on the vehicle appeared extremely dark so much so that he could not observe the driver of the vehicle through the glass or see any light coming through the windows. (Tr. 15:5-11). Dep. Nolen believed the Defendant's window tinting was too dark under Florida's law. Florida law allows an officer to stop a vehicle in instances where the officer believes the vehicle's window tinting is too dark. State v. Moore, 791 So. 2d 1246 (Fla. 1st DCA 2001).

After the Defendant was pulled over, Dep. Nolen took out his department issued tint meter, calibrated it, and tested the driver's and passenger's front window. (Tr. 28:8-18). The readout was eighteen percent (18%) on both the front passenger and front driver's side windows. Dep. Nolen testified that under Florida law, front windows on a vehicle must allow light transmittance at no less than twenty-eight percent (28%). (Tr. 29:17-21). Thus, there was probable cause for Dep. Nolen to stop the Defendant's vehicle per Florida Statute for a window tint violation. . *See* U.S. v. Weaver, 145 Fed. Appx. 639, 641 (11th Cir. 2005) (*citing* Fla. Stat. § 316.2953, holding that a traffic stop was supported by probable cause where the officer believed the vehicle's window tinting was in violation of Florida's legal limits). As a result, it is clear that Dep. Nolen's stop of the Defendant's vehicle was a legal stop.

### *(2) Whether the Subsequent Detention of the Defendant was Unlawful and the Search of his Vehicle was a Product of that Unlawful Detention*

The Defendant argues that he was illegally detained beyond the reasonable scope of the initial traffic stop and that any subsequent search and statements made by the Defendant were the result of that illegal detention. The Government responds that the detention was well within the time frames for a normal traffic stop and any further investigation was consensual.

A traffic stop is a limited seizure within the ambit of the Fourth Amendment's protection against unreasonable searches and seizures. U.S. v. Gonzalez, 275 Fed. Appx. 930, 932-933, 2008 WL 1923073 932-933 (11th Cir. May 2, 2009) (citing U.S. v. Purcell, 236 F.3d 1274, 1277 (11th Cir.2001)). Because a traffic stop "is more analogous to an investigative detention than a custodial arrest ... we analyze the legality of these stops under the standard articulated in Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)." Gonzalez, 275 Fed. Appx. at 932 (citations omitted).

Accordingly, "an officer's actions during a traffic stop must be 'reasonably related in scope to the circumstances which justified the interference in the first place.'" Id. (quoting Terry, 392 U.S. at 20). Moreover, "[i]t is well established that officers conducting a traffic stop may 'take such steps as are reasonably necessary to protect their personal safety.'" Gonzalez, 275 Fed. Appx. 930, 932-933 (citing Purcell, 236 F.3d at 1277) (quoting United States v. Hensley, 469 U.S. 221, 105 S.Ct. 675, 83 L.Ed.2d 604 (1985)).

"[T]he duration of the traffic stop must be limited to the time necessary to effectuate the purpose of the stop." Gonzalez, 275 Fed. Appx. at 933. (emphasis omitted). However, "[a]n officer conducting a routine traffic stop may request consent to search the vehicle." Purcell, 236 F.3d at 1281. When the driver voluntarily consents to a search of his vehicle, "the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given." Id. at 1279 n. 8.

Dep. Nolen estimates that it took him from between 8:10 to 8:13 until 8:20 or 8:25 to prepare the paperwork for a warning. (Tr. 31:6-17). After filling out the warning paperwork, he approached the Defendant, explained the warning, asked him if he had any decal regarding the tint, explained the tint was illegal and that he would have to have it removed, and told him he was free to go at that time. (Tr. 32:22-25, 33:1-4). Thus the initial stop took approximately fifteen (15) minutes.

At the same time Dep. Nolen was giving the Defendant his written warning for the tint violation, he asked the Defendant if he had anything in his vehicle that the deputy should be aware of: dead bodies, guns, bombs, drugs. (Tr. 33:12-14). The Defendant replied there was nothing in the car the Deputy should be aware of. (Tr. 23:3-4). Dep. Nolen then asked the Defendant if he had a problem with him searching the vehicle? The Defendant replied, No. (Tr. 34:7-8). Dep. Nolen

then clarified by asking, No, you're not sure? or No, I can't search?, or No, it's okay, I can search? (Tr. 34:8-9). The Defendant responded, Yes, you can search. (Tr. 34:10).

Where the driver raises no issue concerning the scope or duration of the search, only the time period between the initial stop and the driver's consent is relevant to the reasonableness of the duration of the traffic stop. Purcell, 236 F.3d at 1279; *see also* United States v. Hernandez, 418 F.3d 1206, 1209-10 (11th Cir.2005) (reasoning that where a driver consents to a search of her vehicle and does not challenge the duration of the search, "it is only the intermediate period of ... detention leading up to the consent to search that we must evaluate for constitutional reasonableness.").

It is clear from Dep. Nolen's testimony that the time from the beginning of the initial stop to the time he asked for permission to search the Defendant's vehicle was approximately fifteen (15) minutes. Courts have found that traffic stops that detain an individual between twenty to thirty minutes are reasonable. U.S. v. Hardy, 855 F.2d 735, 757 (11th Cir. 1988) (holding that twenty-eight (28) minutes is not an unreasonable detention for a traffic stop); U.S. v. Williams, 784 F. Supp. 1553, 1559 (M.D. Fla. 1991) *aff'd,* 978 F.2d 721 (table) (11th Cir. 1992) *cert. denied,* 507 U.S. 946 (1993) (holding that a twenty (20) minute detention for a traffic stop was reasonable).

The Defendant argued during closing that the search was beyond the scope of the traffic stop. (Closing Tr. 9:18-24). However, there is nothing that prohibits an officer from asking an individual if he can search his car during a traffic stop. U.S. v. Strickland, 902 F.2d 937, 941 n. 3 (11th Cir. 1990) (holding, "nothing in the Constitution prohibits a police officer who permissibly has stopped an individual from requesting permission to conduct a search even if he has no basis for suspecting that the individual is carrying any contraband."). Furthermore, no limits were placed by the Defendant upon Dep. Nolen's request. As for the duration of the search, the entire encounter took

only thirty-four (34) minutes from the initial stop to the search uncovering the ammunition and the gun, as well as the Defendant's arrest. (Tr. 106:20-23). Thus, given the detention was within the time frame courts have found to be reasonable, only fifteen (15) minutes prior to consent to search and only thirty-four (34) minutes in total, and given that the initial traffic stop was justified, it is respectfully recommended the detention between the initial stop and the consent to search was neither delayed too long nor unreasonable.

### *(3) Whether There was Valid Consent to Search*

The Defendant also argues the subsequent search of the vehicle was illegal because it was the product of the illegal detention. The Defendant argues from U.S. v Riley, 1988 WL 113846 (D.D.C. Oct. 19, 1988), that the consent was not voluntary due to the phrasing of the question by Dep. Nolen. Dep. Nolen originally asked the Defendant if he had anything in his vehicle that the deputy should be aware of: dead bodies, guns, bombs, drugs. (Tr. 33:12-14). In Riley, the officer asked the defendant, Riley, if he could search his bag. 1988 WL 113846 at *4. Riley said yes, but then hesitated. Id. The Court stated at that point the officer was on notice that Riley was withdrawing his consent. Id. Riley asked the officer if he had to let him search his bag. Id. The officer told him no he could only search with his permission. Id. The officer then asked are you going to give me permission to search your bag? Id. The officer did not stop with the inquiry, but continued with "do you have a problem with my searching your bag?" Id. The Riley Court found that the impact of the last question would suggest that Riley had something to hide if he had said yes. Id. Thus, the Riley court found the consent to search was not voluntary.

The instant case is distinguishable from the facts in Riley. In this case, after giving the Defendant the written warning regarding the vehicle tint, the Defendant was told he was free to go.

Once the traffic stop was completed, Dep. Nolen asked the Defendant if he could search the vehicle. (Tr. 34:10). Dep. Nolen testified that he asked the Defendant if he had anything in his vehicle that the deputy should be aware of: dead bodies, guns, bombs, drugs. (Tr. 33:12-14). The Defendant replied that there was nothing in the car he should be aware of. (Tr. 23:3-4). Dep. Nolen then asked the Defendant if he had a problem with him searching the vehicle? The Defendant replied, No. (Tr. 34:7-8 ). Dep. Nolen then clarified by asking, No, you're not sure? or No, I can't search?, or No, it's okay, I can search? (Tr. 34:8-9). The Defendant responded, Yes, you can search. Dep. Nolen felt the Defendant understood his question and that he could search the vehicle, especially in light of his validating the question and answers as listed above. (Tr. 34:11-20 ).

Although Dep. Nolen could not remember the **exact** words he said while speaking with the Defendant, he felt the Defendant understood his question and that he could search the vehicle, especially in light of his validating the question and answers. (Tr. 34:11-20, 59:18-25, 61:9-14). Dep. Nolen's testimony was in agreement with the testimony of Dep. Ellis, the other office who was present when Dep. Nolen asked for permission to search. Dep. Ellis testified that, Dep. Nolen asked the Defendant if he had a problem with them searching the vehicle? (Tr. 125:6-9). The Defendant replied, No. (Tr. 125:21-25, 126:1). Dep. Nolen then confirmed, No you don't want me to search or no, you don't have a problem with me searching? (Tr. 126:1-4 ). The Defendant did not have a problem with them searching the vehicle and gave verbal consent. (Tr. 126:4-7). Thus, the Court finds Dep. Nolen's testimony to be credible regarding whether or not he asked for consent to search the vehicle. The fact that he could not recall verbatim the exact wording is not significant. What is significant is that he did in fact asked for permission and even clarified the request to remove any doubts or confusion about the consent to search.

Dep. Nolen did not coerce the Defendant into agreeing to allow the search nor did he promise him anything nor threaten him in any way. (Tr. 35:14-23 ). The Defendant was not handcuffed at that time and was free to leave. (Tr. 36:7-8). Dep. Nolen also testified that up until the point contraband was found, the Defendant was free to stop the search and leave the scene. (Tr. 97:13-17).

In fact, rather than impose another question that would have left the Defendant without an option except to acquiesce to the request to search, Dep. Nolen asked a clarifying question to ensured he understood the Defendant's position. The Defendant clearly said yes you can search and offered no hesitation and no questions regarding whether or not he had to allow the search.

When the driver voluntarily consents to a search of his vehicle, "the remainder of the detention [is] consensual so long as the scope of the search [does] not exceed the consent given." Purcell, 236 F.3d at 1279 n. 8. Here, Dep. Nolen clearly received uncoerced consent to search the Defendant's vehicle and no testimony was presented that any particular limits were specified by the Defendant regarding the scope of the search. Therefore, it is respectfully recommended that the search of the Defendant's vehicle was not unlawful and not the product of an unlawful detention, but was consensual.

*(4) Whether the Defendant's Statements were Made in Violation of His Miranda Rights*

The Defendant maintains that any and all statements the Government seeks to introduce against him were obtained in violation of Miranda v Arizona.

Miranda v. Arizona, requires that before a defendant in custody can be interrogated that the Defendant be informed of: (1) the Defendant's right to remain silent; (2) that statements can and will be used against them in a court of law; (3) that the Defendant has the right to an attorney during

questioning; and (4) that if the Defendant cannot afford an attorney one will be appointed. 384 U.S. 436, 478-479, 86 S. Ct. 1602, 16 L. Ed. 694 (1966). The Supreme Court defined interrogation as "express questioning or words and actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis, 446 U.S. 291, 300-301, 100 S. Ct. 1682, 64 L. Ed. 297 (1980). Under Miranda, custody is the depravation of freedom of action normally associated with an arrest. Miranda, 384 U.S. at 444. The initial determination of custody depends on the objective circumstances of interrogation and not on the subjective views harbored by either the officer or the Defendant. Stansbury v. California, 511 U.S. 318, 323 (1994) (*per curiam*). A person detained pursuant to a routine traffic stop is not ordinarily considered in custody. Berkemer v. McCarty, 468 U.S. 420, 441, 104 S. Ct. 3138, 82 L. Ed. 2d 317 (1984). Pursuant to Miranda unwarned statements may not be used as evidence in the prosecution's case in chief. U.S. v. Trinidad, 2006 WL 1281034 *2 (M.D. Fla. May 10, 2006) (citing Dickerson v. U.S., 530 U.S. 428, 443-444, 120 S. Ct. 2326, 147 L. Ed. 2d 405 (2000).

In this instance, Dep. Nolen began the search at the front driver's side door of the vehicle. (Tr. 127:19-23). At that time, the Defendant was not handcuffed, but was standing in front of the patrol car which was behind his own vehicle. (Tr. 127:14-18). Dep. Nolen approached the vehicle driver's side door which was already open and located a cigarette box in the driver's side door pocket. (Tr. 37:18-21). He shook the box, which made a metalic sound, opened it, and found five (5) rounds of .38 special ammunition. (Tr. 37:21-25). Dep. Nolen asked the Defendant if they were his. (Tr. 38:18-19). The Defendant indicated they belonged to his boss but that he was aware they were in the vehicle. (Tr. 38:18-22, 40:16-17 ). Based upon that admission, Dep. Ellis placed the Defendant in handcuffs and read him his Miranda warnings from a card. (Tr. 40:18-21). It is clear

that at the time he asked the Defendant if the ammunition was his that Dep. Nolen knew the Defendant was a convicted felon and that a positive response to his question would incriminate the Defendant. Thus, the issue for Miranda purposes was whether or not the Defendant was in custody.

While the Defendant may have perceived the question was directed to him in an incriminating manner, there is no indication that his freedom of movement had been restrained to the degree associated with formal arrest. *See* Trinidad, 2006 WL 1281034 at *3 (citing U.S. v Newton, 369 F.3d 659, 672 (2d Cir. 2004)(holding not every encounter during which a person is not free to leave amounts to custody). At the time the search began, Dep. Nolen testified the Defendant was free to leave. (Tr. 36:7-8). The Defendant voluntarily gave his consent to search the vehicle. (Tr. 34:11-20). The Defendant was not handcuffed and no coercion or force was used to persuade the Defendant to tell Dep. Nolen that he knew the ammunition was in the cigarette box.(Tr. 35:14-23). While there is reason to believe Dep. Nolen's questions may have been intended to elicit incriminating information, the Defendant was not in custody for Miranda purposes when Dep. Nolen asked him if he knew the ammunition was in the cigarette box.

At the hearing, there was some discussion regarding the timing of the Defendant's Miranda warnings. The Defendant argued that his Miranda warnings were not read to him until after the gun was located in the vehicle.

Contrary to the Defendant's argument, Dep. Ellis testified that he observed Dep. Nolen locate some .38 rounds in a cigarette pack. (Tr. 128:15-20). Dep. Nolen approached the Defendant and asked if there was a reason why he had .38 rounds in a cigarette pack? (Tr. 128: 11-13). Dep. Ellis stated the Defendant was also asked if there was a gun as well as the ammunition they had just found. (Tr. 129:19-22). The Defendant stated no. (Tr. 130:1). After the ammunition was found,

Dep. Ellis handcuffed the Defendant since is was illegal for a felon to have ammunition in his possession. (Tr. 128:21-25, 129:1-8). He did not know if, or where there was a gun. (Tr. 129:6). He then read the Defendant his Miranda warnings from a Miranda card. (Tr. 129:17-). He read the warnings at 8:30 pm. (Tr. 133:2-4). The Defendant responded that he understood his rights and would speak with them. (Tr. 131:22-25, 132:1-2).

Dep. Nolen testified that based upon the Defendant's admission he knew the ammunition was in the vehicle, the Defendant was placed in handcuffs by Dep. Ellis and read his Miranda warnings from a card. (Tr. 40:18-21). The Miranda rights were read at 8:30 p.m. (Tr. 133:2-4). The Defendant was placed in handcuffs because he was a convicted felon who had ammunition, and because of officer safety. (Tr. 41:12-19). Dep. Nolen suspected that based upon finding ammunition in the vehicle, there may also be a weapon in the vehicle. (Tr. 42:1-2). Dep. Nolen continued to search the vehicle and found a gun underneath a box speaker in a compartment. (Tr. 43:1-7). Thus, according to Dep. Nolen's testimony the gun was not discovered until after the Defendant was read his Miranda rights by Dep. Ellis. Dep. Lebid does not recall whether or not the Defendant's Miranda rights were read prior to the location of the firearm. (Tr. 177:1-3).

The Defendant cross-examined the officers based upon their reports inquiring whether or not the language of the reports indicated the Defendant's Miranda rights were read prior to the gun being found. The officers reports were not put into evidence by either party. Dep. Ellis told the Defense Counsel that he did not read the report the same as the defense and that he stood by his testimony that he read the Defendant his Miranda rights prior to the gun being found. Upon review of the testimony the Court finds the testimony of Dep. Nolen and Dep. Ellis, and Dep. Lebid to be credible.

Therefore, the Court concludes that the Defendant was read his Miranda rights immediately after the ammunition was discovered and prior to the gun being found.

Dep. Ellis testified that he read the Defendant his Miranda rights off of a card he kept in his pocket for such purposes. (Tr. 129:17-). The Miranda rights from the card read as follows:

> WARNING OF CONSTITUTIONAL RIGHTS
> (1) You have the right to remain silent
> (2) Anything you say cam be used against you in court
> (3) You have the right to talk to a lawyer for advice before we ask you any questions and to have him present with you during questioning if you wish.
> (4) If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.
> (5) If you decide to answer questions now without a lawyer present, you will still have the right to stop answering at any time. You also have the right to stop answering at any time until you talk to a lawyer.

(Gov't. Ex. # 3). During oral argument, the Defendant suggested that his Miranda rights may not have even been read at all. (Closing Tr. 28:15-19). The Court notes that the Defendant did not raise this argument in his brief and that no evidence was presented to the contrary. The Court finds based upon Dep. Ellis' testimony, the testimonies of Dep. Nolen, and Dep. Lebid, and Dep. Ellis's demeanor on the stand, that Dep. Ellis's testimony was credible and that he did read the Defendant his Miranda rights. *See* U.S. v. Ramirez-Chilel, 289 F.3d 744, 749-750 (11th Cir. 2002) (holding the Court must weigh the testimonies of all the witnesses, the consistencies or inconsistencies in their testimonies, their demeanor on the stand and the witnesses' interest in the outcome of the hearing).

After Dep. Ellis read the Defendant his Miranda rights, the Defendant responded that he understood his rights and would speak with the officers. (Tr. 131:22-25, 132:1-2). Thereafter, the Defendant answered questions regarding the ammunition and the gun. Based upon the testimony

and the evidence presented to the Court, it is respectfully recommended that the Defendant was read his Miranda rights after the ammunition was discovered and prior to the gun being found. The Defendant's Miranda rights were not violated when Dep. Nolen initially asked if the ammunition in the cigarette box was his because the Defendant was not in custody at the time.

## CONCLUSION

After hearing the testimony and reviewing the record, the Court concludes that there was probable cause to make the initial traffic stop and further concludes the initial traffic stop was valid. The Defendant gave voluntary consent to have his vehicle searched. The Defendant's Miranda rights were not violated by Dep. Nolen's questions nor by Dep. Ellis and Dep. Lebid's post Miranda questioning

Accordingly, it is now

**RESPECTFULLY RECOMMENDED:**

The Defendant, Ashraf Mohammed's Motion to Suppress Evidence (Doc. #20) should be **DENIED**.

Failure to file written objections to the proposed findings and recommendations contained in this report within ten (10) days from the date of its filing shall bar an aggrieved party from attacking the factual findings on appeal.

**Respectfully Recommended** at Fort Myers, Florida, this __29th__ day of June, 2009.

*Sheri Polster Chappell*
SHERI POLSTER CHAPPELL
UNITED STATES MAGISTRATE JUDGE

Copies: All Parties of Record